## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLANIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>　　　　**Plaintiff,**<br><br>　　**v.**<br><br>**LEON G. COOPERMAN and OMEGA ADVISORS, INC.,**<br><br>　　　　**Defendants.** | Case No. _____<br><br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows against defendants Leon G. Cooperman and Omega Advisors, Inc.:

### SUMMARY

1.　　In July 2010, Leon G. Cooperman generated significant illegal profits by trading in the securities of Atlas Pipeline Partners, L.P. ("APL") on the basis of material nonpublic information that Cooperman misappropriated from a senior APL executive ("APL Executive 1").

2.　　In 2010, Cooperman, through his personal holdings and the client holdings of his investment advisory firm, Omega Advisors, Inc. ("Omega"), was one of APL's largest shareholders.  During the summer of 2010, APL negotiated to sell its Elk City operating facilities ("Elk City"), a substantial company asset.  Cooperman used his status as a significant APL shareholder to gain access to APL Executive 1 and to obtain information about APL's impending sale of Elk City.

3.　　APL Executive 1 shared confidential information with Cooperman about the Elk City sale because he believed Cooperman would maintain the information in confidence and not

trade on it, and because Cooperman explicitly agreed that he would not use the confidential information to trade APL securities. Unbeknownst to APL Executive 1, Cooperman and Omega used this information to trade and acquire APL securities in advance of the public announcement of the Elk City sale, which Cooperman understood would be beneficial for APL's stock price.

4.      On the morning of July 28, 2010, APL announced that it had agreed to sell Elk City for $682 million. APL's stock price jumped over 31% that day, and Cooperman and Omega illegally capitalized on inside information by purchasing APL securities in advance of the public disclosure.

5.      Approximately seventeen months later, Omega received a subpoena regarding trading in APL securities. Cooperman contacted APL Executive 1 and attempted to fabricate a story in case Cooperman and APL Executive 1 were questioned about this trading.

6.      In addition to his unlawful insider trading, Cooperman repeatedly violated the federal securities laws by failing to timely report information about holdings and transactions in securities of publicly-traded companies that he beneficially owned. Indeed, Cooperman violated the beneficial ownership reporting provisions of the federal securities laws over forty times.

7.      By engaging in this conduct, Cooperman violated, and unless enjoined and restrained, will continue to violate Sections 10(b), 13(d) and 16(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b), 78m(d) and 78p(a)], and Rules 10b-5, 13d-1, 13d-2 and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.13d-2 and 240.16a-3], and Omega violated, and unless enjoined and restrained, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

8.      The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u–1] to enjoin such acts, practices, and courses of

2

business, and to obtain disgorgement, prejudgment interest, civil penalties, an officer-and-director bar against Cooperman, and such other and further relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

10.      Venue in this judicial district is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, transactions, practices, and courses of business constituting violations of the federal securities laws alleged herein occurred within the Eastern District of Pennsylvania.

## DEFENDANTS

11.      **Leon G. Cooperman**, age 73, resides in Boca Raton, Florida.  Cooperman is the president, chief executive officer and majority stockholder of defendant Omega.  Cooperman and Omega provide investment advice to Omega's "hedge funds" and other institutional accounts. Cooperman is the Managing Member of Omega Associates, L.L.C., the general partner of certain Omega "hedge funds."  During the relevant time period, Cooperman controlled, managed and/or directed trading for the benefit of Omega Capital Investors, L.P., Omega Capital Equity Investors, L.P., Omega Capital Partners, L.P. and Omega Overseas Partners, Ltd. (together, "Hedge Fund Accounts"), other Omega-advised institutional client accounts ("Managed Accounts"), certain family member accounts ("Family Accounts"), and his offshore tax deferral account ("Cooperman Offshore Account").  In July 2010, Cooperman also served as a director, and chairman of the audit committee of the board of directors, of a publicly-traded company.

12.     **Omega Advisors, Inc.**, a Delaware corporation, is, and was during the relevant time period, a registered investment adviser based in New York, New York.

## RELEVANT ENTITY AND INDIVIDUALS

13.     **Atlas Pipeline Partners, L.P.** was a Delaware limited partnership, with offices in Philadelphia, Pennsylvania, engaged in the business of providing natural gas gathering, processing, and treating services.  Prior to 2015, when it was acquired by Targa Resources Partners LP, APL common units ("stock") traded on the New York Stock Exchange under the ticker symbol "APL."

14.     **APL Executive 1** was an APL officer and director at the time APL sold Elk City, who worked out of APL's Philadelphia, Pennsylvania office.

15.     **Omega Consultant** was a consultant to Omega and provided Cooperman and Omega advice regarding investments in the energy sector, including with respect to APL.

16.     **APL Executive 2** was an APL officer at the time APL sold Elk City.

17.     **APL Executive 3** was an APL director at the time APL sold Elk City.

## COMMONLY USED TRADING TERMS

18.     A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike" price) at a later date.  Options are generally sold in "contracts," each of which gives the option holder the opportunity to buy or sell 100 shares of an underlying stock.

19.     A "call" option gives the purchaser-holder of the option the right, but not the obligation, to purchase a security at the specified strike price within a specific time period.  Generally, the buyer of a call option anticipates that the price of the underlying security will increase during a specified amount of time, and the seller of a call option anticipates that the

4

price of the underlying security will decrease during a specified amount of time.  A call option is "out-of-the-money" if, at the time the holder purchases the call option, the strike price exceeds the current price for the underlying share of stock.

## FACTS

## I.   COOPERMAN AND OMEGA COMMITTED UNLAWFUL INSIDER TRADING

### A.   APL Negotiated the Sale of its Elk City Operating Facilities

20.     By mid-2010, APL had been experiencing financial difficulties.  Though its stated principle objective was to "generate cash for distribution" to its shareholders, APL had not declared a cash dividend for the fiscal quarters ending June 30, 2009 through June 30, 2010.

21.     By May 2010, APL had announced to the market that it intended to improve its balance sheet in order to reinstitute a distribution to APL shareholders.

22.     On May 18, 2010, Enbridge Energy Partners, L.P. ("Enbridge") made a confidential, nonbinding offer to purchase APL's Elk City operating facilities for $720 million. Elk City was a significant APL asset, which included 800 miles of natural gas gathering pipeline, a hydrogen sulfide treating plant, and three cryogenic processing plants, with a total capacity of approximately 370 million cubic feet of natural gas per day and a combined natural gas liquid production of 20,000 barrels per day.

23.     Subsequently, APL retained financial and legal advisors, and the parties conducted due diligence and negotiated the terms of a possible agreement.  From May through July 2010, Enbridge and APL conducted these negotiations pursuant to a confidentiality agreement.  During this time period, APL's executives evaluated the financial impact of selling Elk City at various prices from $550 million to $720 million.

24.     APL advised personnel working on the Elk City sale that information regarding the potential sale was material nonpublic information and that trading on the information would violate APL's insider trading policy.  By July 7, 2010, APL had taken additional steps to ensure secrecy of the Elk City negotiation, including using code names and entering into confidentiality agreements with potential counterparties.

25.     APL's board of directors discussed the potential Elk City transaction during a nonpublic meeting on June 18, 2010.  By the morning of July 7, 2010, APL's board of directors planned to consider the sale of Elk City at the board's July 27, 2010 meeting.

26.     On July 19, 2010, APL agreed to sell Elk City to Enbridge for approximately $680 million, subject to approval by the companies' respective boards of directors and the finalization of deal documentation.  On July 27, 2010, the respective boards of directors of APL and Enbridge approved the Elk City sale.

27.     The next morning, on July 28, 2010, APL publicly announced that it had entered into an agreement to sell Elk City for $682 million in cash.  APL stated that the asset sale would enable the company to:  (a) eliminate virtually all of its senior secured debt and significantly deleverage its balance sheet; (b) allow APL to reinstate distributions to shareholders; and (c) allow APL to participate in its Marcellus Shale gathering venture.  That day, APL's share price increased by $3.87 or approximately 31.3%, closing at $16.22 per share.  The price of APL's bonds and other APL-related securities also increased significantly as a result of APL's public announcement of the Elk City sale.

6

**B.      Cooperman Was One of APL's Largest Shareholders and Had Great Influence and Access at APL**

28.      By July 2010, Cooperman had been a hedge fund manager for a number of years. One strategy Cooperman employed was to accumulate large positions in publicly-traded companies and develop close relationships with those companies' senior executives.

29.      Cooperman employed this strategy with APL.  According to a statement he filed with the Commission, as of December 31, 2009, Cooperman was the beneficial owner of over nine percent of APL's common stock, worth approximately $46 million.  By mid-2010, Cooperman had developed close relationships with APL's senior executives.

30.      As a result of his APL ownership and status, Cooperman had a level of access to APL's executives that was not available to APL's smaller shareholders.  Through this access, Cooperman had numerous telephone conversations and meetings with APL executives.

31.      During the first half of 2010, Cooperman reduced his stake in APL, by, among other things, directing accounts he controlled to sell APL stock worth millions of dollars. Indeed, until July 7, 2010, there was no day in 2010 on which the Cooperman Offshore Account, Hedge Fund Accounts, Managed Accounts and Family Accounts collectively were net buyers of APL common stock, call options or bonds.  In an April 30, 2010 email, Cooperman stated that he was "scaling out of APL on strength."  The Cooperman Offshore Account, Hedge Fund Accounts, Managed Accounts and Family Accounts did not trade APL stock, options or bonds in the six weeks prior to July 7, 2010.

32.      On July 7, 2010, Cooperman expressed to Omega Consultant that APL was a "shitty business."

7

**C.     In July 2010, Cooperman Misappropriated Information about the Elk City Sale from APL Executive 1**

33.     Cooperman spoke with APL Executive 1 on the telephone on July 7, 19 and 20, 2010.  During these telephone conversations, APL Executive 1 informed Cooperman that APL was negotiating the sale of Elk City and Cooperman asked APL Executive 1 questions about the Elk City sale.  In at least one of these conversations, APL Executive 1 told Cooperman that APL was selling its Elk City facility for approximately $650 million.

34.     Despite knowing that information about the Elk City sale was material nonpublic information, APL Executive 1 told Cooperman about the Elk City sale because he believed Cooperman had an obligation not to use this information to trade APL securities.  Indeed, during one of these conversations in which APL Executive 1 told Cooperman confidential information about the Elk City sale, Cooperman explicitly agreed that he could not and would not use the confidential information APL Executive 1 told him to trade APL securities.  Cooperman, however, did not abide by his agreement to maintain in confidence, and not trade on the basis of, the Elk City sale information.

35.     On July 7, 2010, Cooperman spoke to APL Executive 1 at approximately 2:06 p.m. EDT for about six minutes.  Despite taking a bearish position on APL throughout the first half of 2010 and calling APL a "shitty business" earlier that day, after speaking to APL Executive 1, Cooperman began buying APL securities.

36.     On July 7, 2010, at Cooperman's and Omega's direction, the Cooperman Offshore Account, Hedge Fund Accounts and Managed Accounts purchased a total of 1,966 APL call options with a strike price of $15.00, expiring August 21, 2010.  The call options purchases accounted for over 90% of the day's trading volume in that option series.  On July 7,

8

2010, APL's stock price closed at $9.66, and the call options the Cooperman Offshore Account, Hedge Fund Accounts and Managed Accounts purchased were significantly out-of-the-money.

37.    At Cooperman's and Omega's direction, the Cooperman Offshore Account, Hedge Fund Accounts and Managed Accounts continued to purchase APL securities between July 8, 2010 and July 19, 2010.  The chart below reflects these purchases:

| Date | Security | Quantity | Average Purchase Price | Closing Price of APL Stock |
|------|----------|----------|------------------------|-----------------------------|
| July 8, 2010 | APL call options with $15.00 strike price, expiring August 21, 2010 | 20 | $0.05 | $10.68 |
| July 13, 2010 | APL stock | 101,100 | $11.2548 | $11.25 |
| | APL 8.125% bonds due December 15, 2015 | 3,500,000 | $92.00 | |
| | APL call options with $15.00 strike price, expiring August 21, 2010 | 1,980 | $0.10 | |
| July 15, 2010 | APL stock | 62,500 | $10.9834 | $10.97 |
| July 16, 2010 | APL stock | 125,000 | $10.7586 | $10.63 |
| July 19, 2010 | APL stock | 55,000 | $10.4219 | $10.28 |

38.    On July 19, 2010, at approximately 3:19 p.m. EDT, Cooperman spoke on the telephone with APL Executive 1, while APL Executive 1 was located in the Eastern District of Pennsylvania.  By the time of this telephone conversation, APL had reached an agreement in principle to sell Elk City.  APL senior executives, including APL Executive 1, were preparing for a July 27, 2010 meeting of APL's board of directors to discuss the Elk City sale.

39.    On July 19, 2010, after his call with APL Executive 1, Cooperman created an entry on his electronic calendar for July 27, 2010 at 10:30 a.m. with the subject line "APL Board Meeting."

40.     On July 20, 2010, at approximately 9:43 a.m. EDT, Cooperman spoke on the
telephone with APL Executive 1 for about seven minutes, while APL Executive 1 was located in
the Eastern District of Pennsylvania.

41.     Almost as soon as his call with APL Executive 1 concluded, at approximately
9:50 a.m. EDT, Cooperman called Omega Consultant on the telephone.  During the telephone
conversation, Cooperman told Omega Consultant that Cooperman had learned from someone at
APL that APL had reached a deal to sell Elk City for $650 million.  Cooperman and Omega
Consultant discussed how APL's stock price would react to public disclosure of the Elk City
sale.  Omega Consultant told Cooperman that the announcement that APL was going to sell Elk
City for $650 million would cause APL's stock price to increase significantly.

42.     On July 20, 2010, Cooperman and Omega directed the purchase of more APL
securities, as follows:

   a.  The Cooperman Offshore Account, Hedge Fund Accounts and Managed
       Accounts purchased a total of 3,800 out-of-the-money APL call options with a
       strike price of $15.00, expiring November 20, 2010.  This activity constituted
       over 95% of the daily volume of trading in that option series;

   b.  In an account Cooperman managed on behalf of a minor family member,
       Cooperman purchased $50,000 of APL's 8.75% bonds due June 15, 2018 at an
       average price of $92.75 per unit; and

   c.  The Cooperman Offshore Account purchased 61,700 APL shares at an average
       price of $10.3056.

43.     On July 21, 2010, based on the material nonpublic information Cooperman told
Omega Consultant, Omega Consultant incorporated a $650 million asset sale into Omega

Consultant's model of APL's financials, which Omega Consultant saved on Omega's computer systems. Omega Consultant's revised model indicated that APL's Elk City sale would significantly enhance APL's credit standing and the company's ability to reinstitute cash distributions on an earlier-than-expected schedule and in larger-than-expected amounts.

44.      At Cooperman's and Omega's direction, the Cooperman Offshore Account, Family Accounts, Hedge Fund Accounts and Managed Accounts continued to purchase APL securities between July 21, 2010 and July 27, 2010.  The chart below reflects these purchases:

| Date | Security | Quantity | Average Purchase Price | Closing Price of APL Stock |
|------|----------|----------|------------------------|----------------------------|
| July 21, 2010 | APL 8.125% bonds due December 15, 2015 | 1,000,000 | $93.50 | $11.20 |
| | APL call options with $17.50 strike price, expiring August 21, 2010 | 3,021 | $0.05 | |
| July 22, 2010 | APL call options with $17.50 strike price, expiring November 20, 2010 | 1,250 | $0.30 | $12.03 |
| July 26, 2010 | APL call options with $17.50 strike price, expiring November 20, 2010 | 10 | $0.35 | $13.17 |
| July 27, 2010 | APL call options with $17.50 strike price, expiring November 20, 2010 | 500 | $0.35 | $12.35 |

45.      The July 21, 2010 purchase of 3,021 APL call options with a strike price of $17.50, expiring August 21, 2010, made up the entire daily volume of trading in that option series. The July 22, 2010 purchase of 1,250 APL call options with a strike price of $17.50, expiring November 20, 2010, made up the entire daily volume of trading in that option series. The July 27, 2010 purchase of 500 APL call options with a strike price of $17.50, expiring November 20, 2010, made up the entire daily volume of trading in that option series.

46.     On July 22, 2010, at approximately 9:40 a.m. EDT, Cooperman called APL

Executive 2's Philadelphia, Pennsylvania office telephone line.  Cooperman asked APL

Executive 2 about the progress of the Elk City sale.  APL Executive 2 was surprised that

Cooperman knew about the Elk City sale given that APL had taken substantial steps to keep the

transaction confidential.

47.     On July 27, 2010, at approximately 7:52 p.m. EDT, Cooperman spoke on the

telephone with APL Executive 1, who told Cooperman that APL's board had approved the Elk

City sale.

48.     On July 27, 2010, at approximately 8:36 p.m. EDT, Cooperman sent an email to a

family member, who also was a hedge fund manager, stating:

> Good news on APL . . . [t]hey sold their ELK City operation for $682mm
> which will enable them to pay off bank debt, de-risk company because
> keep whole contracts largely gone and fund their Laurel Mountain
> obligations.  We think stock worth at least $15 in near term---for what that
> is worth.

Cooperman's family member forwarded this email to a colleague who replied, in part:  "That

explains the fishy $17 August calls, etc.  I still haven't come across any press release – want to

see how it's discussed . . . ."  Cooperman's family member responded:  "Somebody should

investigate that."

49.     On July 27, 2010 at approximately 9:20 p.m. EDT, Cooperman emailed two

Omega traders, stating:  "APL has done a major deal and I'm told there will be a call at 10:30am.

Please get me dial in info."

50.     Then at 9:44 p.m. EDT on July 27, 2010, Cooperman sent an email to an Omega

trader, stating:  "When you get in please check how much APL we could buy to get to 9.9% . . .

Depending on trading level we might add."  Federal securities laws generally require a person to

disclose within ten days that he has become the beneficial owner of greater than ten percent of a class of equity securities, like APL stock.

51.     On July 28, 2010, at approximately 6:59 a.m. EDT, APL publicly announced for the first time that it was selling Elk City for $682 million.  As a result, on that day, APL's stock price increased approximately 31% and other APL-related securities greatly increased in value.

52.     After this announcement, Cooperman emailed a family member stating that: "[minor family member] will be pleased to know that the bond I bought [for minor family member] the other day has risen 7% in price as the company just sold some assets that resulted in an improvement of their credit standing."

53.     The Cooperman Offshore Account, Hedge Fund Accounts, Managed Accounts and Family Accounts generated profits of approximately $4.09 million by trading APL securities at Cooperman's direction between July 7, 2010 and July 27, 2010.

54.     As a result of Cooperman's and Omega's unlawful conduct, at Cooperman's direction, the Cooperman Offshore Account, Hedge Fund Accounts, Managed Accounts and Family Accounts made significant ill-gotten gains by trading on the basis of material nonpublic information about APL's Elk City sale.

**D.      Cooperman Concealed and Then Attempted To Cover-Up His Insider Trading**

55.     Cooperman carefully guarded the information he misappropriated from APL Executive 1, communicating it to Omega Consultant, but not sharing it with his family member, who was also a hedge fund manager and at times an APL investor.  Indeed, on July 28, 2010, after APL announced the Elk City sale, Cooperman's hedge fund manager family member

13

emailed APL Executive 3 twice, complaining about APL options activity prior to the public announcement of the Elk City sale, stating:

> Can you please call me[?]  Been trying to get you last few days[.]  [T]here had been some fishy options trades in apl [sic] before this that somebody should investigate.
>
> ***
>
> I also would like to make sure that the sec [sic] looks into the shady option trades and volume in apl [sic] last 2 weeks or so in front of this deal[.] How do I become a whistle blower[?]

56.     APL Executive 1 was shocked and angered when he learned that Cooperman and/or accounts that Cooperman managed traded in APL securities in advance of the public announcement of the Elk City sale.

57.     In late 2011 or early 2012, Cooperman spoke on the telephone with APL Executive 1.  During this call, Cooperman informed APL Executive 1 that the Commission had sent Omega a subpoena relating to trading in APL securities in advance of the announcement of the Elk City sale.  Cooperman improperly sought APL Executive 1's assurance that APL Executive 1 had not shared confidential information with him in advance of the announcement of the Elk City sale, despite knowing this was not true.  APL Executive 1 believed that Cooperman was attempting to fabricate a story in case the two were questioned about their conversations regarding Elk City.

58.     In late 2011, Cooperman also informed APL Executive 3 that the Commission had sent Omega a subpoena relating to APL trading in advance of the announcement of the Elk City sale.  Cooperman told APL Executive 3 to tell APL Executive 1 that Cooperman and APL Executive 1 had not discussed confidential information related to the Elk City sale prior to the time APL publicly announced it.

59.     In connection with an investigation concerning Cooperman's and Omega's

conduct, including the trading in APL securities referenced above, the Commission issued a

subpoena for Cooperman's testimony.  Cooperman invoked his Fifth Amendment privilege

against self-incrimination in response to Commission questions regarding Cooperman's and

Omega's trading in APL securities.

**E.      Cooperman and Omega Violated Federal Securities Laws Prohibiting Insider
         Trading**

60.     The information that Cooperman and Omega misappropriated from APL

Executive 1 about the Elk City sale was nonpublic.

61.     The information that Cooperman and Omega misappropriated from APL

Executive 1 about the Elk City sale was material.  A reasonable investor would have viewed this

information as being important to his investment decision and/or significantly altering the total

mix of information available to the public.  Indeed, the day APL publicly announced the Elk City

sale, APL's stock price increased approximately 31 percent.

62.     Cooperman and Omega knew or were reckless in not knowing that the

information about the Elk City sale Cooperman misappropriated from APL Executive 1 was

material and nonpublic.

63.     Cooperman agreed to maintain the information about the Elk City sale in

confidence and not use it to trade.

64.     Cooperman and Omega owed a duty of trust or confidence to APL Executive 1,

which required them to maintain in confidence the information about the Elk City sale and to not

trade on the basis of it.

65.     Cooperman and Omega knew or were reckless in not knowing that they owed a duty of trust of confidence to APL Executive 1, which required them to maintain in confidence the information about the Elk City sale and to not trade on the basis of it.

66.     In breach of a duty of trust or confidence, Cooperman and Omega knowingly or recklessly traded APL securities on the basis, and while in possession, of material nonpublic information related to APL's Elk City sale that Cooperman obtained from APL Executive 1.

67.     Members of the investing public who traded APL securities at the same time as Cooperman and Omega were harmed because Defendants gained an advantageous market position through their misappropriation and use of material nonpublic information.

68.     As the CEO, president and majority stockholder of Omega, Cooperman acted on behalf of Omega, and controlled that entity and the Hedge Fund Accounts and Managed Accounts on whose behalf he illegally traded APL securities.  Omega is liable for insider trading on the basis of Cooperman's conduct.

## II.     COOPERMAN REPEATEDLY VIOLATED THE FEDERAL SECURITIES LAWS' BENEFICIAL OWNERSHIP REPORTING REQUIREMENTS

69.     The federal securities laws generally require any person or group who directly or indirectly acquires beneficial ownership of more than five percent or ten percent of the equity securities of a publicly-traded company to file public statements with the Commission to report information about their holdings and transactions.

70.     These beneficial ownership reports give investors the opportunity to evaluate whether the holdings and transactions of company insiders and large shareholders could be indicative of the company's future prospects.  For example, Form 4 is a report that corporate officers, directors, and certain beneficial owners of more than ten percent of a registered class of

16

a company's stock generally must use to report their transactions in company stock within two business days.  In addition, Schedules 13D and 13G are reports that beneficial owners of more than five percent of a registered class of a company's stock generally must use to report holdings or intentions with respect to the company.

71.     Since August 2010, Cooperman repeatedly has failed to file timely beneficial ownership reports regarding his holdings and transactions in public company securities. Cooperman violated the beneficial ownership reporting provisions over forty times with respect to eight different issuers.

72.     In connection with some of these failures, the delay in filing, or failure to file altogether, allowed Cooperman and Omega to continue to trade in the securities of a given company and potentially obtain advantageous prices by removing the risk that the public announcement of Cooperman's holdings or transactions would impact the price of the securities.

A.     **ASPS**

73.     **Altisource Portfolio Solutions S.A.** ("ASPS") is a Luxembourg corporation headquartered in Luxembourg City, Grand Duchy of Luxembourg, that provides real estate and mortgage portfolio management and related technology products.  Altisource Portfolio Solutions S.A.'s common stock is registered under Section 12(b) of the Exchange Act, carries voting rights, and is publicly traded on the NASDAQ Global Select Market under the ticker symbol "ASPS."

74.     On April 21, 2014, hedge fund and institutional accounts over which Cooperman had investment power acquired 50,000 shares of ASPS common stock.  As a result, Cooperman became the beneficial owner of 1,125,932 ASPS shares, or 5.06% of the outstanding shares. Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder required Cooperman to make a

17

beneficial ownership filing within ten days of the acquisition that resulted in beneficial

ownership exceeding 5%, or by May 1, 2014. However, Cooperman did not file an initial

Schedule 13G to report his April 2014 crossing over the 5% threshold until January 23, 2015,

over eight months late. In the meantime, from April 24, 2014 through the remainder of 2014,

accounts beneficially owned by Cooperman engaged in numerous ASPS securities transactions,

acquiring a net total of 1,131,519 ASPS shares or more than an additional 5%, without

Cooperman having filed any beneficial ownership reports concerning ASPS.

75.     On December 18, 2014, hedge fund and institutional accounts over which

Cooperman had investment power purchased 175,000 shares of ASPS common stock. As a

result, Cooperman became the beneficial owner of 2,196,444 shares, or 10.8% of ASPS's

outstanding shares, based on 20,271,929 shares outstanding according to ASPS's Form 10-Q

filed on October 23, 2014 for the period ended September 30, 2014. Section 16(a) of the

Exchange Act and Rule 16a-3 thereunder required that Cooperman file an initial statement of

beneficial ownership on Form 3 within ten days, or by Monday, December 29, 2014.

Cooperman did not file the required Form 3 until January 21, 2015, over three weeks late.

76.     On December 19, 2014 and December 22, 2014, Omega Capital Partners, L.P.,

Omega Equity Investors, L.P. and Omega Capital Investors, L.P. each purchased additional

shares of ASPS exceeding $10,000 in market value. Cooperman had investment power over

these three private funds, and Cooperman was a limited partner of these three funds. Pursuant to

Rule 16a-1(a)(2) under the Exchange Act, Cooperman had a pecuniary interest in these

transactions. Accordingly, Rule 16a-3 required that Cooperman report these transactions to the

extent of his pecuniary interest therein on Form 4 within two business days, or by December 23,

18

2014 and December 24, 2014. Cooperman did not report these transactions until January 21,

2015, approximately four weeks late.

77.     The same three Omega funds sold ASPS shares on December 23, 2014, while

Cooperman continued to be the beneficial owner of greater than 10% of ASPS. To date,

Cooperman has not reported the December 23, 2014 transactions as required on either Form 4 or

Form 5. He thus also has violated Section 16(a) of the Exchange Act and Rule 16a-3 with

respect to these transactions. Cooperman's late Form 4 dated January 21, 2015 listed the

incorrect amounts of shares held by the three private funds because the December 23, 2014 sales

were not taken into account.

78.     On July 29, 2016, while Cooperman was a beneficial owner of greater than 10%

of ASPS's outstanding common shares, Omega Capital Partners, L.P., Omega Equity Investors,

L.P. and Omega Capital Investors, L.P. purchased additional shares of ASPS exceeding $10,000

in market value. Cooperman did not report these transactions to the Commission on Form 4 until

August 12, 2016, ten days after Section 16(a) of the Exchange Act and Rule 16a-3 required that

he do so. During the period of time in which Cooperman had not, but should have, reported

these transactions, the three Omega funds purchased additional shares of ASPS.

**B.     ARP**

79.     **Atlas Resource Partners, L.P.** ("ARP") was a Delaware master-limited

partnership headquartered in Pittsburgh, Pennsylvania, that was an independent developer and

producer of natural gas, crude oil and natural gas liquids. Prior to its delisting and restructuring

in the summer of 2016, Atlas Resource Partners, L.P.'s common units representing limited

partnership interests were registered under Section 12(b) of the Exchange Act, carried voting

rights, and traded on the New York Stock Exchange under the ticker symbol "ARP."

19

80.     On February 8, 2013, Cooperman filed a Schedule 13G disclosure with the Commission indicating that he was the beneficial owner of 2,877,736 common units of ARP, or approximately 7.2% of the total outstanding units.  He amended that filing twice in December 2013.  In the second amendment, filed on December 10, 2013, Cooperman reported that he was the beneficial owner of 6,753,919 ARP common units, or approximately 11.2% of the total outstanding units.  In 2014, accounts over which Cooperman had investment power engaged in a number of trades of ARP common units.  Because of these 2014 trades, Cooperman was required to file an amended disclosure by February 16, 2015.  Cooperman did not file the required amendment until October 26, 2015, over eight months late.

81.     On November 12, 2013, a number of accounts over which Cooperman had investment power purchased ARP common units, and Cooperman became a beneficial owner of greater than 10% of ARP's outstanding common units.  He filed a Form 3 in this regard on November 22, 2013.  However, on four occasions between November 14 and 19, 2013, while he was a beneficial owner of more than 10% of ARP common units, Cooperman purchased ARP common units in his personal account or his wife's account.  Pursuant to Rule 16a-1(a)(2)(ii)(A) under the Exchange Act, Cooperman is presumed to be the beneficial owner of his wife's shares for Section 16(a) reporting purposes.  Rule 16a-3 under the Exchange Act required Cooperman to file a Form 4 with the Commission reflecting these transactions within two business days following the respective transaction dates, or between November 18 and 21, 2013.  However, Cooperman did not report these transactions on Form 4 until December 11, 2013, approximately three weeks late.

## C.   CHRS

82.   **Charming Shoppes, Inc.** ("CHRS") was a Pennsylvania corporation headquartered in Bensalem, Pennsylvania engaged in the clothing retail business. The common stock of Charming Shoppes was registered under Section 12(b) of the Exchange Act, carried voting rights, and traded on the NASDAQ Global Select Market under the ticker symbol "CHRS." Ascena Retail Group, Inc. acquired Charming Shoppes in 2012.

83.   On December 12, 2011, Cooperman filed a Form 3 indicating that he owned greater than 10% of the outstanding shares of CHRS, as a result of acquisitions of CHRS common stock on December 1, 2011 by accounts over which he had investment power. After Cooperman became the beneficial owner of greater than 10% of the outstanding shares, but before he filed the Form 3 on December 12, 2011, accounts he controlled purchased an additional 75,000 shares of CHRS common stock. In particular, on December 6, 2011, Omega Capital Partners, L.P., Omega Equity Investors, L.P. and Omega Capital Investors, L.P. each purchased additional shares of CHRS exceeding $10,000 in market value, and Omega Capital Partners, L.P. did so again on December 7, 2011. Cooperman had a pecuniary interest in these Omega funds' transactions. Accordingly, Rule 16a-3 under the Exchange Act required that Cooperman report the funds' transactions to the extent of his pecuniary interest therein on Form 4 within two business days, or by December 8 and 9, 2011, and to file a Form 5 within 45 days after the issuer's fiscal year end to disclose transactions not previously reported on Form 4. To date, Cooperman has not reported these CHRS transactions on either Form 4 or Form 5. Therefore, he has violated Section 16(a) and Rule 16a-3.

**D.     DLIA**

84.     **dELiA*s, Inc.** ("DLIA") was a Delaware corporation headquartered in New York, New York, engaged in the clothing retail business.  dELiA*s, Inc.'s common stock was registered under Section 12(b) of the Exchange Act, carried voting rights, and traded on the NASDAQ Global Market under the ticker symbol "DLIA."  On December 7, 2014, the company filed petitions for relief under Chapter 11 of the United States Bankruptcy Code, and the company's common stock since has been delisted from the NASDAQ.

85.     On November 5, 2013, Cooperman filed an initial Schedule 13G indicating that he was the beneficial owner of 4,761,905 shares of DLIA common stock, or approximately 6.9% of the total outstanding shares.  On June 24, 2014, Cooperman filed an amendment to his Schedule 13G, indicating that he was the beneficial owner of 8,511,905 shares of DLIA common stock, or approximately 11.4% of the total outstanding shares of DLIA common stock.  Cooperman filed this Schedule 13G amendment to reflect an increase in his beneficial ownership, which occurred as a result of the conversion of a note into preferred stock, which was in turn convertible into common stock.  In the filing, Cooperman overstated his ownership of common stock by 61,905 shares, which he had sold on April 14, 2014.  As of June 24, 2014, Cooperman actually was the beneficial owner of 8,450,000 shares, consisting of 4,700,000 shares of common stock and 30,000 shares of preferred stock that were convertible into 3,750,000 shares of common stock.  This was equivalent to approximately 11.3% of the total outstanding shares of DLIA.

86.     As a result of several transactions between July 23, 2014 and November 18, 2014, Cooperman was the beneficial owner of *zero* DLIA shares by the end of the day on November 18, 2014.  Seventeen days later, on December 5, 2014, DLIA announced that it had reached an

22

agreement to liquidate its assets, and soon thereafter it filed for Chapter 11 bankruptcy

protection. Cooperman sent emails on November 19, 2014 and December 5, 2014, indicating

that he was fully aware that he no longer held any DLIA securities. Nevertheless, despite going

from an 11.3% holder to a 0% percent holder, to date Cooperman has not filed any amendments

to his Schedule 13G for DLIA since the June 24, 2014 filing. Because of his status as a greater

than 10% owner who had filed an initial Schedule 13G pursuant to Rule 13d-1(c), Cooperman

was required by Rule 13d-2(d) under the Exchange Act to file an amendment on Schedule 13G

"promptly" upon decreasing his beneficial ownership by more than 5%. In addition, Rule 13d-

2(b) under the Exchange Act required that Cooperman file a Schedule 13G amendment within 45

days after the end of the calendar year. Cooperman thus violated Section 13(d) and Rule 13d-2

by failing to amend his Schedule 13G in connection with the divestiture of his DLIA position.

87.     On June 24, 2014, Cooperman filed a Form 3 indicating that he owned greater

than 10% of the outstanding shares of DLIA. At this time, the entirety of Cooperman's position

in DLIA was held in his personal account. In the Form 3, Cooperman overstated his ownership

of common stock by 61,905 shares, which he had sold on April 14, 2014. As of June 24, 2014,

Cooperman actually was the beneficial owner of 8,450,000 shares. This was equivalent to

approximately 11.3% of the total outstanding shares of DLIA.

88.     Cooperman then divested his entire DLIA position prior to November 19, 2014.

While still personally a holder of greater than 10% of the outstanding shares of DLIA,

Cooperman sold DLIA common stock out of his personal account on July 23, 2014, August 4,

2014, August 5, 2014 and August 6, 2014. Pursuant to Rule 16a-3 under the Exchange Act,

Cooperman was required to report these transactions on Form 4 within two business days

following the respective transaction dates, and to file a Form 5 within 45 days after the issuer's

23

fiscal year end to disclose transactions not previously reported on Form 4.  To date, Cooperman has not reported these DLIA transactions on either Form 4 or Form 5.  Therefore, he has violated Section 16(a) and Rule 16a-3.

**E.      ERS**

89.      **Empire Resources, Inc.** ("ERS") is a Delaware corporation headquartered in Fort Lee, New Jersey, that purchases, sells and distributes semi-finished aluminum products to builders of vehicles and fabricators of consumer products.  Empire Resources, Inc.'s common stock is registered under Section 12(b) of the Exchange Act, carries voting rights, and trades on the NASDAQ Capital Market under the ticker symbol "ERS."

90.      In June 2011, Cooperman and The Leon and Toby Cooperman Family Foundation (the "Foundation"), for which Cooperman had investment power, each acquired $4,000,000 principal amount of ERS Convertible Senior Subordinated Notes due June 1, 2016.  The notes were convertible into ERS common stock.  By no later than February 4, 2013, ERS was listed on the NASDAQ Capital Market, the common stock underlying the convertible notes was registered under Section 12(b) of the Exchange Act, and Cooperman's and the Foundation's notes each were freely convertible into greater than 5% of ERS common stock.   As a result, by operation of Rules 13d-3(d)(1) and 13d-5 under the Exchange Act, Cooperman became the beneficial owner of, and acquired, more than 5% of a class of ERS equity securities covered by Rule 13d-1.  Accordingly, Rule 13d-1 required Cooperman to file a beneficial ownership report within 10 days.  However, Cooperman did not a file a Schedule 13G until long after that, on September 15, 2014, and, therefore, he violated Section 13(d)(1) and Rule 13d-1(a).

91.      As stated above, by no later than February 4, 2013, ERS was listed on the NASDAQ Capital Market, the common stock underlying the convertible notes was registered

under Section 12(b) of the Exchange Act, and Cooperman's and the Foundation's notes each

were freely convertible into greater than 5% of ERS common stock.   As a result, Cooperman

became the beneficial owner of more than 10% of the outstanding shares of ERS, and Rule 16a-3

under the Exchange Act required that he file an initial statement of beneficial ownership on Form

3.  However, Cooperman did not file his Form 3 until September 17, 2014, approximately

nineteen months late.

     **F.**     **MDCA**

     92.     **MDC Partners Inc.** ("MDCA") is a Canadian corporation headquartered in New

York, New York, engaged in the business of providing marketing, activation, communications

and marketing effectiveness solutions and services.  MDC Partners Inc.'s common stock is

registered under Section 12(b) of the Exchange Act, carries voting rights, and trades on the

NASDAQ National Market under the ticker symbol "MDCA."

     93.     On August 30, 2010, Cooperman filed a Schedule 13G indicating that, as of

August 19, 2010, he was the beneficial owner of 1,434,500 shares of MDCA common stock, or

approximately 5.2% of the outstanding shares.  On February 7, 2011, Cooperman filed his annual

amendment to Schedule 13G, indicating that, as of December 31, 2010, he was the beneficial

owner of 1,466,600 shares of MDCA common stock, or approximately 4.98% of the then-

outstanding shares.  Pursuant to Rule 13d-2(b), as a result of this amendment, which reflected

Cooperman's holding of less than 5% of MDCA's outstanding shares, no additional Section

13(d) filings were required, absent a change in circumstances after December 31, 2010.

     94.     On January 13, 2011, Cooperman purchased 33,400 shares of MDCA common

stock, which caused him to cross back above the 5% threshold.  As of the end of the day on

January 13, 2011, Cooperman personally owned 1,500,000 shares, or 5.1% of MDCA, based on

the 29,459,856 shares outstanding according to MDCA's Form 10-Q for the period ended
September 30, 2010.  Rule 13d-1 under the Exchange Act required Cooperman to file a
beneficial ownership report within 10 days of his acquisition of MDCA shares on January 13,
2011.  He did not file a Schedule 13G until approximately two years later, on February 7, 2013,
thereby violating Section 13(d)(1) and Rule 13d-1(a).  Cooperman also continued to trade
MDCA common stock in 2011.  Pursuant to Rule 13d-2(b) under the Exchange Act, within 45
days after December 31, 2011 (or by mid-February 2012), Cooperman was required to file a
Schedule 13G amendment reflecting changes in the information he was required to have reported
in the Schedule 13G that he should have filed in January 2011.  Cooperman filed that
amendment on February 7, 2013, nearly one year late.

95.     The late Schedule 13G amendment that Cooperman filed in February 2013 with
respect to the end of calendar year 2011 indicated that as of December 31, 2011, Cooperman was
the beneficial owner of 1,434,500 shares of MDCA, or 4.8% of the outstanding shares.
Therefore, again, absent a change in circumstances, no additional Section 13(d) filings were
required thereafter.  But, again, circumstances did change.  On April 17, 2012, as a result of
purchases of MDCA common stock that Cooperman made in accounts over which he had
investment power, Cooperman's beneficial ownership crossed back above the 5% threshold.
Accordingly, Rule 13d-1 under the Exchange Act required Cooperman to file a disclosure within
10 days after the April 17, 2012 trades, but he did not file a Schedule 13G until over nine months
later, on February 8, 2013.  Cooperman thus violated Section 13(d) and the rules thereunder three
times by failing to file the required reports with respect to MDCA until long after they were due.

26

## G.     NEWM

96.     **New Media Investment Group Inc.** ("NEWM") is a Delaware corporation headquartered in New York, New York, that owns, operates and invests in local media assets. New Media Investment Group Inc.'s common stock is registered under Section 12(b) of the Exchange Act, carries voting rights, and trades on the New York Stock Exchange under the ticker symbol "NEWM."

97.     On January 30, 2014, the registration of NEWM common stock became effective. That same day, Cooperman filed an initial statement of beneficial ownership on Form 3, reflecting his beneficial ownership of greater than 10% of the outstanding shares of NEWM. On February 4, 2014, NEWM's common stock began trading on the New York Stock Exchange. That day, Cooperman purchased 200,501 shares of NEWM in his wife's account. Pursuant to Rule 16a-1(a)(2)(ii)(A) under the Exchange Act, Cooperman is presumed to be the beneficial owner of such shares for Section 16(a) reporting purposes. Rule 16a-3 therefore required that Cooperman report this transaction to the extent of his pecuniary interest therein on Form 4 by February 6, 2014. He did not file the required Form 4 until June 9, 2014, over four months late.

## H.     REXI

98.     **Resource America, Inc.** ("REXI") was a Delaware corporation headquartered in Philadelphia, Pennsylvania, engaged in the business of specialized asset management in the real estate, financial fund and commercial finance segments. Resource America, Inc.'s common stock was registered pursuant to Section 12(b) of the Exchange Act, carried voting rights, and traded on the NASDAQ Global Select Market under the ticker symbol "REXI." On September 8, 2016, REXI was acquired by C-III Capital Partners, LLC.

99.     On February 7, 2011, Cooperman filed an annual Schedule 13G amendment indicating that, as of December 31, 2010, he was the beneficial owner of 605,800 shares of REXI common stock. The filing stated that this was equivalent to 3.2% of the outstanding shares, and that Cooperman was reporting that he had ceased to be the beneficial owner of more than 5% of REXI. However, the filing omitted that Cooperman personally owned warrants freely convertible into 833,333 common shares of REXI. Cooperman had purchased the warrants on December 9, 2010 from a family partnership over which Cooperman had investment power as its general partner. Cooperman indicated his awareness that the filing did not include the warrants in an email exchange with REXI's CEO on February 8, 2011. Taking into account the warrants, as of December 31, 2010, Cooperman was the beneficial owner of at least 7.2% of the outstanding shares of REXI, based on the 19,047,282 outstanding shares reflected on REXI's Form 10-K filed on December 13, 2010 for the period ended September 30, 2010. Cooperman thus filed an inaccurate Schedule 13G amendment in violation of Section 13(d) and Rule 13d-2. Furthermore, accounts over which Cooperman had investment power traded REXI common stock throughout 2011. Taking into account his ownership of the warrants, and the corresponding underlying common stock he was deemed to beneficially own by virtue of the application of Rule 13d-3(d)(1) under the Exchange Act, Rule 13d-2(b) under the Exchange Act required Cooperman to file a Schedule 13G amendment within 45 days after December 31, 2011 (or by mid-February 2012). He did not file any such Schedule 13G amendment. After he acquired additional REXI securities on July 2, 2012, Cooperman finally did disclose his ownership of the REXI warrants in a Schedule 13G filed on July 9, 2012.

100.     As of August 15, 2010, Cooperman was the beneficial owner of at least 1,995,000 common shares of REXI. In addition, at that time, a family partnership over which Cooperman

had investment power, held warrants freely convertible into 833,333 common shares of REXI.
Taking into account the warrants, Cooperman was the beneficial owner of at least 14.2% of the
outstanding shares of REXI, based on the 19,013,909 outstanding shares reflected on REXI's
Form 10-Q filed on August 9, 2010 for the period ended June 30, 2010.  As a beneficial owner of
more than 10% of REXI, Cooperman was required by Rule 16a-3 under the Exchange Act to
report certain transactions on Form 4.

101.    Between August 16, 2010 and September 9, 2010, Cooperman sold a total of
750,000 common shares of REXI out of accounts he controlled.  Cooperman timely filed a Form
4 reflecting a family partnership account's sale, which occurred on August 16, 2010.  On August
17, 2010, Cooperman personally sold 142,000 REXI shares, and directed the sale of 100,000
REXI shares out of his wife's account.  Thereafter, on eleven different days between August 18,
2010 and September 9, 2010, Cooperman personally sold an additional 308,000 shares of REXI.
Notwithstanding these sales, taking into account the warrants, Cooperman remained the
beneficial owner of greater than 10% of REXI throughout the time period between August 17,
2010 and September 9, 2010.  However, to date, Cooperman has not filed a Form 4 reflecting
any of the REXI transactions in his personal account or his wife's account during that period.
Nor did he file a Form 5 to report holdings and transactions that should have been reported
during REXI's then-most-recent fiscal year.  Cooperman thus repeatedly violated Section 16(a)
and Rule 16a-3 in connection with his summer 2010 trades in REXI securities.

## III.    TOLLING OF STATUTE OF LIMITATIONS

102.    Cooperman and Omega agreed to toll any statute of limitations applicable to the
claims alleged herein during the periods from May 7, 2015 through March 1, 2016, March 24,
2016 through June 23, 2016, and July 5, 2016 through August 27, 2016.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against Cooperman and Omega)

103.   The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 102, inclusive, as if they were fully set forth herein.

104.   At the time of each illegal trade identified herein, the information concerning the Elk City sale that Cooperman and Omega misappropriated from APL Executive 1 was nonpublic.

105.   At the time of each illegal trade identified herein, the information concerning the Elk City sale that Cooperman and Omega misappropriated from APL Executive 1 was material—it would be important to a reasonable investor in making his or her investment decision, and, indeed, it was important to Cooperman and Omega when making the investment decisions.  There is a substantial likelihood that the disclosure of the misappropriated information would have been viewed by a reasonable investor as having significantly altered the total mix of information available to investors.  In addition, the information was considered confidential by APL, and APL had policies and procedures protecting confidential information.

106.   By engaging in the conduct described above, defendants Cooperman and Omega knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

    a.   employed devices, schemes or artifices to defraud;

    b.   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

30

     c.     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

107.    Omega is liable for insider trading on the basis of Cooperman's conduct because Cooperman was at all relevant times Omega's CEO, president and majority stockholder and he controlled Omega-advised accounts that illegally traded APL securities.

108.    By engaging in the foregoing conduct, defendants Cooperman and Omega, directly or indirectly, violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 Thereunder**
**(Against Cooperman)**

109.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 108, inclusive, as if they were fully set forth herein.

110.    Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 [17 C.F.R. §§240.13d-1 and 240.13d-2] thereunder, require a person who acquires, directly or indirectly, the beneficial ownership of more than 5% of a class of equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file with the Commission a disclosure statement on Schedule 13D or Schedule 13G [17 C.F.R. §§240.13d-101 or 240.13d-102] within a prescribed time period, and to file amendments to such disclosure statement within a prescribed time period.

111.    As set forth above, Cooperman, after acquiring directly or indirectly the beneficial ownership of more than 5% of a class of equity securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] failed to file with the Commission statements and/or

amendments thereto containing information required by Schedule 13D and/or Schedule 13G [17 C.F.R. §§240.13d-101 and/or 240.13d-102] within the time period prescribed.

112.    By reason of the foregoing, defendant Cooperman violated, and unless enjoined and restrained will continue to violate, Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rules 13d-1 and 13d-2 [17 C.F.R. §§240.13d-1 and 240.13d-2] thereunder.

### THIRD CLAIM FOR RELIEF
### Violations of Section 16(a) of the Exchange Act and Rule 16a-3 Thereunder
### (Against Cooperman)

113.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 112, inclusive, as if they were fully set forth herein.

114.    Cooperman, as, directly or indirectly, the beneficial owner of more than ten percent of a class of equity securities (other than an exempted security) which was registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], was required timely and accurately to file Forms 3, 4 and 5 with the Commission disclosing information about his holdings and transactions in the relevant issuer's securities.

115.    As set forth above, defendant Cooperman violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a) and Rule 16a-3 [17 C.F.R. § 240.16a-3] thereunder by failing to file timely and accurate Forms 3, 4 or 5 with the Commission.

116.    By reason of the foregoing, defendant Cooperman violated, and, unless enjoined and restrained, again will violate Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a) and Rule 16a-3 [17 C.F.R. § 240.16a-3] thereunder.

### PRAYER FOR RELEIF

**WHEREFORE**, the Commission respectfully requests that the Court enter final judgment:

**I.**

Permanently restraining and enjoining Cooperman from, directly or indirectly, engaging in conduct in violation of Sections 10(b), 13(d) and 16(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(d) and 78p(a)] and Rules 10b-5, 13d-1, 13d-2 and 16a-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.13d-1, 240.13d-2 and 240.16a-3], and Omega from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**II.**

Ordering Defendants to disgorge the unlawful trading profits, and any other ill-gotten gains, derived from the activities set forth herein, together with prejudgment interest thereon.

**III.**

Ordering Defendants to pay civil monetary penalties, including but not limited to civil penalties up to three times the insider trading profits made, pursuant to Sections 21(d) and 21A of the Exchange'Act [15 U.S.C. §§ 78u(d) and 78u–1].

**IV.**

Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], prohibiting defendant Cooperman from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## V.

Granting such other and further relief as this Court may deem just, proper, equitable, or necessary.

Dated:  September 21, 2016

Respectfully Submitted,

BY:_____

G. Jeffrey Boujoukos (PA Bar 67215)
David L. Axelrod
Brendan P. McGlynn
Oreste P. McClung
Mark R. Sylvester
Polly A. Hayes
Attorneys for Plaintiff
Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone:  (215) 597-3100
Facsimile:  (215) 597-2740