IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SECURITIES AND EXCHANGE :        CIVIL ACTION
COMMISSION                               :
                                                   :        No. 16-5043
        v.                                       :
                                                   :
LEON G. COOPERMAN, et al.       :

# MEMORANDUM

**Juan R. Sánchez, J.**                                                **March  20, 2017**

The Securities and Exchange Commission (SEC) brings this civil enforcement action

against Leon G. Cooperman and his investment advisory firm, Omega Advisors, Inc. (Omega),

alleging Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the

Exchange Act) and Rule 10b-5 by engaging in insider trading.  The SEC also alleges Cooperman

violated §§ 13(d) and 16(a) of the Exchange Act by failing to file with the SEC required reports

regarding his beneficial ownership of securities of eight different public companies.  Cooperman

and Omega move to dismiss the § 10(b) and Rule 10b-5 insider trading claim for failure to state a

claim upon which relief can be granted pursuant to Federal Rules of Civil Procedure 12(b)(6)

and 9(b).  Defendants also move to dismiss the §§ 13(d) and 16(a) claims for improper venue

pursuant to Rule 12(b)(3).  Defendants' motion as to the insider trading claim will be denied, as

the SEC has pleaded a plausible claim for insider trading with the necessary particularity.

Because venue appears improper in this District with respect to the §§ 13(d) and 16(a) claims,

Defendants' motion will be granted as to those claims.

BACKGROUND[1]

Cooperman, who resides in Boca Raton, Florida, is the president, chief executive officer, and majority stockholder of Omega, a registered investment advisory firm incorporated in Delaware and based in New York.  Cooperman and Omega provide investment advice to Omega's hedge funds and other institutional clients.  During the relevant time period, Cooperman managed or directed trading for the benefit of various accounts, including certain Omega hedge fund accounts (collectively, the Hedge Fund Accounts), institutional client accounts (Managed Accounts), certain family member accounts (Family Accounts), and his own offshore tax deferral account (Offshore Account).

As of December 31, 2009, Cooperman was the beneficial owner of over nine percent of the common stock of Atlas Pipeline Partners, L.P. (APL), a Delaware limited partnership with offices in Philadelphia, Pennsylvania, an investment worth approximately $46 million.  During the first half of 2010, Cooperman reduced his stake in APL, which was experiencing financial difficulties.  By mid-2010, Cooperman had developed close relationships with APL's senior executives.

In May 2010, APL received a confidential offer to purchase APL's Elk City operating facilities, a significant APL asset, for $720 million.  Between May and July 2010, APL and the prospective purchaser negotiated terms of the potential sale pursuant to a confidentiality agreement.

---

[1] The following facts are drawn from the SEC's Complaint, the allegations of which the Court accepts as true for purposes of deciding the instant motion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding a court considering a Rule 12(b)(6) motion to dismiss should "assume the[] veracity" of the complaint's "well-pleaded factual allegations"); *Bockman v. First Am. Mktg. Corp.*, 459 F. App'x 157, 158 n.1 (3d Cir. 2012) (holding a court evaluating a motion to dismiss for improper venue "accept[s] as true all of the allegations in the complaint, unless those allegations are contradicted by the defendants' affidavits").

On July 7, 19, and 20, 2010, Cooperman had telephone conversations with "APL Executive 1," an APL officer and director, who told Cooperman that APL was negotiating the sale of Elk City for approximately $650 million. Although APL Executive 1 knew the Elk City sale was material nonpublic information, he believed Cooperman had an obligation not to use that information to trade APL securities, and during one of the aforementioned phone conversations, Cooperman explicitly agreed that he could not and would not use the confidential information to trade APL securities. At Cooperman's and Omega's direction, however, the Cooperman Offshore Account and the Hedge Fund and Managed Accounts began purchasing large quantities of APL securities between July 7, 2010 and July 19, 2010.

By the time Cooperman spoke with APL Executive 1 on July 19, 2010, APL had reached an agreement to sell Elk City, and APL was preparing for a July 27, 2010, board meeting to discuss the sale. On July 20, 2010, immediately following another telephone conversation with APL Executive 1, Cooperman informed an Omega consultant that he had learned from someone at APL that APL had reached a deal to sell Elk City for $650 million. Cooperman and the consultant discussed the impact the sale would have on APL stock price, and the consultant expressed the view that the announcement of the sale would cause APL's stock price to increase significantly. That same day, Cooperman and Omega directed the purchase of additional APL securities worth approximately $620,000. Over the next week, between July 21, 2010 and July 27, 2010, Cooperman and Omega continued to direct the purchase of APL securities.

On July 27, 2010, APL Executive 1 informed Cooperman that APL's board had approved the Elk City sale. The next day, APL publicly announced for the first time that it was selling Elk City for $682 million. As a result of the announcement, APL's stock price increased approximately 31% and other APL-related securities greatly increased in value. The trades

Cooperman directed in APL securities between July 7, 2010 and July 27, 2010 generated profits of approximately $4.09 million for the Offshore Account, Hedge Fund Accounts, Managed Accounts, and Family Accounts.

On September 21, 2016, the SEC filed its Complaint, alleging Defendants committed insider trading by trading on the Elk City sale information.   The SEC relies on the misappropriation theory of insider trading, which imposes liability on a corporate outsider who uses material nonpublic information to trade in securities, in breach of a duty of trust and confidence owed to the source of the information.  The SEC further claims, since August 2010, Cooperman has failed to timely file beneficial ownership reports reflecting his holdings and transactions in the securities of eight public companies, in violation of federal securities laws. Defendants move to dismiss the Complaint, asserting the SEC has failed to sufficiently plead an insider trading claim, and this District is not the proper venue to adjudicate the filing claims.

**DISCUSSION**

**A.**     **Failure to State a Claim**

In order to survive a Rule 12(b)(6) motion to dismiss for a failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks removed).   A claim is facially plausible when the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*   The "plausibility" standard is not a "probability requirement" but rather a requirement of more than a "sheer possibility that a defendant has acted unlawfully."  *Id*.  A complaint which "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks omitted)).   In evaluating a complaint's sufficiency under these standards, the court must first "tak[e] note of the elements a plaintiff must plead to state a claim."   *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 675).   Next, the court should "identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'"   *Id.* (quoting *Iqbal*, 556 U.S. at 679).   Finally, where there are well pleaded allegations, the court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."   *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Claims pursuant to § 10(b) and Rule 10b-5, including insider trading claims, are subject to heightened pleading standards under Rule 9(b), which requires a party to "state with particularity the circumstances constituting fraud."   Fed. R. Civ. P. 9(b); *see Key Equity Inv'rs, Inc. v. Sel-Leb Mktg. Inc*., 246 F. App'x 780, 784 (3d Cir. 2007) ("[I]n assessing the sufficiency of a § 10(b) claim, we . . . observe the heightened pleading requirements of [Rule] 9(b)[.]").   "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue."   *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotation marks and citation omitted).

Cooperman and Omega contend the insider trading claim should be dismissed because the SEC has failed to plead with particularity when, exactly, Cooperman agreed not to use the confidential information provided by APL Executive 1.   The parties agree that under the misappropriation theory, the SEC must allege that Cooperman—the outsider—owed a duty of trust and confidence to APL Executive 1—the source—before trading on the information.   They

disagree, however, as to whether the law requires that duty to have existed at the time APL Executive 1 provided the information to Cooperman in order to constitute insider trading. According to Defendants, the timing of the agreement is critical because they can be liable for insider trading under the misappropriation theory only if Cooperman agreed not to trade before receiving the confidential information, as the agreement is the sole basis for the existence of the duty of trust and confidence.  Defendants argue the Complaint is fatally flawed because it is silent as to whether the agreement occurred before or after the disclosure of information.  The SEC disputes Defendants' legal interpretation, arguing there is no requirement under the misappropriation theory that an agreement not to trade precede disclosure of the confidential information, so long as a duty of trust and confidence exists at the time the recipient trades on the information.  In the SEC's view, insider trading occurred when Cooperman traded in breach of his agreement not to trade on the Elk City sale information.   The Complaint alleges the agreement was made during a telephone call on July 7, 19, or 20, 2010.  The SEC argues that because at least some trading occurred after the agreement, those trades constitute insider trading.  The Court agrees with the SEC.

Section 10(b) forbids any person to "use or employ, in connection with the purchase or sale of any security . . . [,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  To enforce § 10(b), the SEC promulgated Rule 10b-5, which makes it unlawful for any person, in connection with the purchase or sale of security, "[t]o employ any device, scheme or artifice to defraud," or "[t]o engage in any act, practice, or course of business which operates or would operate as fraud or deceit upon any person."  17 C.F.R. § 240.10b-5; *see also United States v. Haddy*, 134 F.3d 542, 548 (3d Cir. 1998).  The proscriptions of § 10(b) and Rule 10b-5 are broad

and inclusive.  *United States v. McGee*, 763 F.3d 304, 315 (3d Cir. 2014).  "The legislative history demonstrates that § 10(b) was aimed at '*any* . . . manipulative or deceptive practices which [the SEC] finds detrimental to the interests of the investor,'" *id.* (quoting S. Rep. No. 73–792, at 18 (1934)), in order to "insure the maintenance of fair and honest markets in [securities] transactions," *id.* (quoting 15 U.S.C. § 78b).  As such, the Supreme Court and the Third Circuit have instructed that § 10(b) and Rule 10b-5 should be "construed not technically and restrictively, but flexibly to effectuate [their] remedial purposes."  *Id.* (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)); *see also Haddy*, 134 F.3d at 548 (noting that in an effort to comport with Congress's intent to "minimize fraud in securities trading," the "Supreme Court has interpreted [§] 10(b) and Rule 10b-5 expansively").

The misappropriation theory of insider trading targets "deceptive trading by outsiders who owe no duty to shareholders."  *McGee*, 763 F.3d at 310.  Under this theory, a person "violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information."  *United States v. O'Hagan*, 521 U.S. 642, 652 (1997).  "[A] fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information."  *Id.*  The misappropriation theory thus "premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information."  *Id*.  As the Ninth Circuit Court of Appeals has observed:

> Properly understood, the misappropriation theory only bars trading on the basis of information that the wrongdoer converted to his own use in violation of some fiduciary, contractual, or similar obligation to the owner or rightful possessor of the information. The misappropriation theory, so understood, comports well with our intuition about what is wrong with trading on nonpublic

> information. Most of us would not perceive such trading to be
> unfair merely because one trading party knows more than another.
> . . . On the other hand, no one likes to play a game with an
> opponent who has loaded the dice. We think that those who have
> special access to information, because of employment or other
> relationships, should be barred from using that information to gain
> an advantage over the rest of us.

*SEC v. Talbot*, 530 F.3d 1085, 1096 (9th Cir. 2008) (ellipses in original) (quoting Barbara Bader

Aldave, *Misappropriation: A General Theory of Liability for Trading on Nonpublic Information*,

13 Hofstra L. Rev. 101, 12–23 (1984)).

In order to clarify which relationships give rise to a duty of trust and confidence, the SEC

promulgated Rule 10b5-2.  *See McGee*, 763 F.3d at 311-12.  The Rule provides a non-exclusive

list of "circumstances in which a person has a duty of trust or confidence for purposes of the

'misappropriation' theory of insider trading."  17 C.F.R. § 240.10b5–2(b).  Such circumstances

include "[w]henever a person agrees to maintain information in confidence," *id.* § 240.10b5–

2(b)(1), and "[w]henever the person communicating the material nonpublic information and the

person to whom it is communicated have a history, pattern, or practice of sharing confidences,

such that the recipient of the information knows or reasonably should know that the person

communicating the material nonpublic information expects that the recipient will maintain its

confidentiality," *id.* § 240.10b5–2(b)(2).

Here, the SEC alleges Cooperman had a duty of trust and confidence toward APL

Executive 1 as a result of an explicit agreement "that he could not and would not use the

confidential information APL Executive 1 told him to trade APL securities."  Compl. ¶ 34.  The

agreement may or may not have preceded disclosure of the information from APL Executive 1,

but preceded at least some of Defendants' trades using the information.  Whether liability under

the misappropriation theory of insider trading may be premised on a post disclosure agreement is a novel issue.  The parties agree no court has squarely addressed this issue.

The Court is persuaded the SEC's interpretation better accords with the language of the regulation, applicable case law, and congressional intent.  A plain reading of the regulation indicates a duty created by an agreement may arise at any time.  Under Rule 10b-5, "'a duty of trust or confidence' exists . . . *[w]henever* a person agrees to maintain information in confidence." 17 C.F.R. § 240.10b5–2(b)(1) (emphasis added).   The creation of the duty is therefore not limited in time. *See SEC v. J.W. Barclay & Co.*, 442 F.3d 834, 840 (3d Cir. 2006) ("[T]he scope of liability created by a particular section of the [securities laws] must rest primarily on the language of that section." (quoting *Pinter v. Dahl*, 486 U.S. 622, 653 (1988))).

Further, case law applying the misappropriation theory does not require an agreement not to trade to precede the disclosure of confidential information.  Courts have made clear that the central concern of insider trading under the misappropriation theory is the deception that occurs at the time the outsider uses material nonpublic information to trade in securities.  *See O'Hagan*, 521 U.S. at 656 ("[F]raud is consummated, not when the fiduciary gains the confidential information, but when, without disclosure to the principal, he uses the information to purchase or sell securities."); *McGee*, 763 F.3d at 311 ("The crux of insider trading liability is deception without disclosure.").  In fact, cases in which an agreement is alleged to be at least a partial source of a duty of trust and confidence suggest that the agreement may be made post disclosure. *See SEC v. Yun*, 327 F.3d 1267, 1274 (11th Cir. 2003) (finding sufficient evidence of a duty of trust and confidence to deny summary judgment where insider and outsider had a history or pattern of sharing business confidences and outsider "explicitly accepted the duty to keep in confidence the business information she received" simultaneously or just after the disclosure of

that information); *SEC v. Sargent*, 229 F.3d 68, 71, 76 (1st Cir. 2000) (holding a jury could reasonably find a duty of trust and confidence existed where the insider and outsider had a pre-existing fiduciary relationship and an agreement not to disclose information was made simultaneously or just after disclosure of information); *SEC v. Lyon*, 605 F. Supp. 2d 531, 545-46 (S.D.N.Y. 2009) (denying summary judgment where sufficient evidence of a duty of confidentiality was established, in part, by outsider simultaneously accepting confidential documents and agreeing to keep the information confidential).

Defendants argue these same cases, and others, suggest a duty of trust and confidence must precede disclosure, citing language from the opinions to the effect that the misappropriation theory applies when an outsider "obtains access to . . . property to serve the ends of the fiduciary relationship." *United States v. Chestman*, 947 F.2d 551, 569 (2d Cir. 1991); *see also Yun*, 327 F.3d at 1269 ("The misappropriation theory . . . imposes liability on 'outsiders' who trade on the basis of confidential information obtained by reason of their relationship with the person possessing such information, usually an insider."); *Sargent*, 229 F.3d at 75 ("[T]he existence of a fiduciary relationship turns on whether the source of the misappropriated information granted the misappropriator access to confidential information in reliance on a promise by the misapprorpriator that the information would be safeguarded."); *United States v. Willis*, 737 F. Supp. 269, 274 (S.D.N.Y. 1990) ("The underlying rationale of the misappropriation theory is that a person who receives secret business information from another because of an established relationship of trust and confidence between them has a duty to keep that information confidential. By breaching that duty . . . the fiduciary is defrauding the confider who was entitled to rely on the fiduciary's tacit representation of confidentiality."); *United States v. Reed*, 601 F. Supp. 685, 718 (S.D.N.Y. 1985) (holding the government was required to prove that disclosure

of confidential information was "made in the context and as a result of a pre-existing confidential relationship"), *rev'd on other grounds*, 773 F.2d 477 (2d Cir. 1985).  Although such cases may frame the issue as one involving reliance, they do not mandate that where a relationship of trust and confidence is based on an agreement rather than a preexisting relationship of trust, the exchange of information must be made in reliance on that agreement, as discussed above.[2] Moreover, the cases cited by Defendants are distinguishable because the courts inquired whether a relationship of trust—evident from a history of sharing confidences—existed before disclosure, creating a duty of trust and confidence.  *See Yun*, 327 F.3d at 1267; *Sargent*, 229 F.3d at 76; *Chestman*, 947 F.2d at 567-71; *see also McGee*, 763 F.3d at 309 (focusing only on Rule 10b5-2(b)(2), and analyzing the relationship between the insider and outsider and "their long history of sharing confidences");  *U.S. SEC v. Talbot*, 430 F. Supp. 2d 1029, 1054–55 (C.D. Cal. 2006), (noting "a fiduciary relationship or its functional equivalent exists only if the party that receives nonpublic information explicitly agrees to maintain it confidentially, or if it has an existing relationship of trust and confidence with the source of the information that places it under an

---

[2] At first glance, *Sargent* seems to suggest otherwise.  In discussing the evidence of a duty of trust, the court noted the insider provided the confidential information concerning negotiations between two companies to the outsider, and the outsider promised not to divulge the information. The court further noted "a jury could reasonably infer that [the insider] relied on this promise, since throughout the . . . negotiations [the insider] continued to share an office with [the outsider] . . . in which it was inevitable [the outsider] would know something was going on." *Id.* at 76. Yet, because the original promise in that case was made simultaneously or just after the disclosure of information, any continued reliance on the promise does not affect the analysis. Defendants' reliance on this case is therefore misplaced.

Defendants also argue *O'Hagan* recognized a duty of trust and confidence "arises only if the recipient has '*obtained* confidential information *by reason of*' a relationship of trust and confidence." Defs.' Reply 3 (quoting *O'Hagan*, 521 U.S. at 652).  This statement, however, appears in the Supreme Court's discussion of the traditional theory of insider trading, which occurs when a corporate insider obtains confidential information "by reason of [his] position *with that corporation*," i.e., a relationship of trust and confidence with the shareholders of the company.  *O'Hagan*, 521 U.S. at 652.  Again, Defendants' reliance on such language is misplaced.

implicit duty to do so" (citations omitted)), *rev'd on other grounds*, *SEC v. Talbot*, 530 F.3d 1085 (9th Cir. 2008).   In such instances, the duty necessarily has to precede the disclosure because the existence of the duty depends on the insider and outsider's past relationship.   Here, the question is only whether a duty existed before the trade, as the agreement is not bound to preexisting circumstances.

The SEC's interpretation is also consistent with the principle that § 10(b) and Rule 10b-5 are to be construed broadly, not technically.   *See J.W. Barclay & Co.*, 442 F.3d at 841 (noting that although the Supreme Court looks to the specific language of securities law for their meaning, "the Court has also cited the remedial purposes of the securities laws when defining specific terms" (citing cases)).   Finding the misappropriation theory may encompass post-disclosure agreements comports with the congressional intent for securities laws to target exactly the type of deception in which Cooperman engaged, deception that is detrimental to the rightful owner of the information, investors, and the public.   *See Talbot*, 530 F.3d at 1096; *McGee*, 763 F.3d at 315; *see also O'Hagan*, 521 U.S. at 653 (noting the misappropriation theory was "designed to protect the integrity of the securities markets against abuses by outsiders to a corporation who have access to confidential information that will affect the corporation's security price when revealed, but who owe no fiduciary or other duty to that corporation's shareholders").

Finally, accepting Defendants' interpretation would create a loophole in the SEC's enforcement scheme for corporations and the outsiders to whom they provide material non-public information, legalizing insider trading by means of sequencing.   Under Regulation Fair

Disclosure (Regulation FD),[3] if a corporate insider supplies confidential information to an outsider without obtaining an agreement not to trade, and the outsider proceeds to trade using the information, the corporation is held liable. *See* 17 C.F.R. § 243.100(a), (b)(2). Significantly, the corporation may insulate itself from liability by obtaining an agreement not to trade from the outsider *before or after* the disclosure of information.[4] *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716-01, 2000 WL 1197687, at *51,720 n.28 (Aug. 24, 2000). If the insider obtains an agreement not to trade before disclosure, and the outsider nonetheless trades on the information, the outsider is held liable under the misappropriation theory of insider trading for breaching the agreement-created duty. The loophole is exposed in a third scenario, where the insider supplies the information and then obtains an agreement from the outsider to abstain from trading, as in the present case. If the Court were to accept Defendants' position, when the outsider proceeds to trade on the information, neither the outsider nor the corporation would be held liable. The insider's failure to obtain an agreement not to trade before disclosing the confidential information would insulate the outsider from liability under the misappropriation theory. But the insider's procurement of such an agreement after the disclosure would insulate the corporation from liability under Regulation FD. As the SEC argued, although Defendants

---

[3] Regulation FD requires an issuer who "discloses any material nonpublic information regarding that issuer or its securities" to "make public disclosure of that information" except where disclosure is made to "a person who owes a duty of trust or confidence to the issuer" or to "a person who expressly agrees to maintain the disclosed information in confidence." 17 C.F.R. § 243.100(a), (b)(2).

[4] Regulation FD states: "[I]t will not be necessary for the issuer to obtain a confidentiality agreement before making the disclosure. An agreement obtained after the disclosure is made, but before the recipient of the information discloses or trades on the basis of it, will be sufficient. In this manner, an issuer who has mistakenly made a selective disclosure of material information may try to avoid any harm resulting from the selective disclosure by obtaining from the recipient of that disclosure an agreement not to disclose or trade on the basis of the information." Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716-01, 2000 WL 1197687, at *51,720 n.28.

seek "a free pass for well-timed deception[,] [n]o such free pass is found in the language of Section 10(b) of the Exchange Act."  Hr'g Tr. 31, Feb. 7, 2017.  Indeed, the Court agrees with the SEC that Regulation FD and Rule 10b5-2 were designed to "work together to close any loopholes."  *Id.* at 38; *see* Selective Disclosure and Insider Trading, 2000 WL 1197687, at *51,716 (noting Regulation FD and Rule 10b5-2, adopted at the same time in 2000, were "designed to promote full and fair disclosure of information by insurers, and to clarify and enhance existing prohibitions against insider trading").

The SEC's allegations that Defendants traded APL securities following three telephone calls during which APL Executive 1 disclosed material non-public information concerning a $650 million transaction, and Cooperman at some point agreed not to trade on that information, sufficiently plead the "who, what, when, where, and how" concerning Defendants' insider trading, giving rise to a plausible misappropriation claim.  *See In re Rockefeller*, 311 F.3d at 217; *see also SEC v. Aragon Capital Mgmt., LLC*, No. 07-919, 2008 WL 216320, at *3 (S.D.N.Y. Jan. 16, 2008) (finding complaint sufficient where "[a]lthough the contents of the tip are not specifically set forth, the general subject matter and unlawful nature of the communication are, which is sufficient to apprise [the defendant] of the Commission's insider trading claim against him," and the complaint made "clear that all of the tipping leading to [the] trades" occurred during a one-month period).

**B.     Venue**

Venue for claims brought under the Exchange Act is governed by 15 U.S.C. § 78aa, which permits an action for violation of the federal securities laws to be brought in "the district wherein any act or transaction constituting the violation occurred" or "in the district wherein the defendant is found or is an inhabitant or transacts business."  *See also Zazzali v. Alexander*

14

*Partners, LLC*, No. 12-828, 2013 WL 5357044, at *3 (D. Del. Sept. 25, 2013) (noting venue is proper under § 78aa in any district "(1) in which any act or transaction constituting the violation occurred, or in which the defendant (2) is found, (3) is an inhabitant or (4) transacts business"). The burden of proving improper venue lies with the defendant. *Great W. Min. & Mineral Co. v. ADR Options, Inc.*, 434 F. App'x 83, 86 (3d Cir. 2011).

Cooperman moves to dismiss the §§ 13(d) and 16(a) claims for improper venue.  The SEC argues venue is proper in this District because the Complaint sufficiently alleges "any act or transaction" constituting the §§ 13(d) and/or 16(a) violations occurred within this District and because Cooperman "transacts business" in this District.

As to the "any act or transaction" basis for venue, the §§ 13(d) and 16(a) claims are based on Cooperman's failure to timely file beneficial ownership reports regarding his holdings and transactions in the securities of eight public companies.  Although two of the companies for which Cooperman failed to make the required filings are located within this District, the reports were required to be filed only with the SEC in the District of Columbia.  *See* 15 U.S.C. §§ 78m(d) (requiring the filing of reports with the SEC by person acquiring more than five percent of certain classes of securities), 78p(a) ("Every person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security . . . shall file the [required] statements with the Commission.").  Because the act of filing, including the failure to file, "has a locus in the District of Columbia, . . . venue for civil enforcement actions of the Commission, involving reports required to be filed in the District of Columbia, is [in the District of Columbia]."  *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1154 n.12 (D.C. Cir. 1978) (citations and internal quotation marks omitted).  Cooperman's alleged failure to file beneficial ownership reports concerning the transactions and holdings of two public companies located within this

15

District was therefore an omission to act constituting the alleged violation only within the District of Columbia.[5]

The Complaint also fails to sufficiently allege Cooperman transacts business in this District. The law is unsettled as to the extent to which a defendant must transact business in a district for venue purposes. *Compare Zazzali v. Alexander Partners, LLC*, No. 12-828, 2013 WL 5357044, at *3 (D. Del. Sept. 25, 2013) (finding venue improper where defendant "neither allege[d] in his [c]omplaint nor argue[d] in his responsive brief that any of the [m]oving [d]efendants conduct[ed] their ordinary business in [the district where suit was brought]"); *Birdman v. Electro-Catheter Corp.*, 352 F. Supp. 1271, 1273 (E.D. Pa. 1973) ("In order for a defendant to be 'transacting business' in a given district, its activities (therein) must constitute a substantial part of its ordinary business and must be continuous and of some duration." (citing *United Indus. Corp. v. Nuclear Corp. of Am.*, 237 F. Supp. 971 (D. Del. 1964))); and *Sch. Dist. of Phila. v. Kurtz Bros.*, 240 F. Supp. 361, 364 (E.D. Pa. 1965) (finding venue improper where defendant's in-district activity did "not amount to transacting business in any substantial manner," as the activities were "extremely light, sporadic and unsolicited"), *with Livingston v. Weis, Voisin, Cannon, Inc.*, 294 F. Supp. 676, 682-83 (D.N.J. 1968) (disagreeing with the foregoing line of cases and holding the "transacting business" standard requires only "a single act" by an out-of-state entity to establish venue); *see also Zorn v. Anderson*, 263 F. Supp. 745, 747 (S.D.N.Y. 1966) ("The concept of 'transacting business' under the [Exchange Act's] venue

---

[5] The SEC argues Rules 16a-3(e) and 13d-7 require the delivery of copies of the 16a and 13(d) reports to the issuer, *see* 17 C.F.R. §§ 240.16a–3(e), 240.13d–7, and Cooperman's failure to comply with this requirement as to the two companies located in this District are thus acts within this District. The failure to deliver copies, however, does not constitute the alleged violations of §§ 13(d) and 16(a). *See Southmark Prime Plus, L.P. v. Falzone*, 768 F. Supp. 487, 488 (D. Del. 1991) (noting the "any act" "basis for venue requires but one act within the forum district which represents more than an immaterial part of the allegedly illegal events").

provision[] requires less business activity than that necessary to sustain jurisdiction under a 'doing business' or 'minimum contacts' standard; it is intended to have a more flexible and broader meaning than the jurisdictional predicates."). The Complaint lacks any allegations that Cooperman performed continuous and substantial business in this District, and thus fails to meet the majority "transacting business" test for venue.[6]

The SEC argues its allegations meet the "transacting business" test because Cooperman has been the beneficial owner of over nine percent of three companies based in this District and has communicated with executives of these companies here. In its response to the motion to dismiss, the SEC also raises new facts not alleged in the Complaint, which it contends establish venue: Cooperman has solicited at least one client located in this District, directed trades that took place on the Nasdaq PHLX, and was an activist shareholder in Resource America, Inc., a company located in the District.

The Court finds Cooperman's beneficial ownership interest in three companies based in this District does not establish venue. One of the three companies—APL—is not the subject of the alleged §§ 13(d) and 16(a) violations, and Cooperman's ownership interest in this company is thus unrelated to the SEC's filing claims. The second company—Resource America, Inc. (REXI)—ceased to be public on September 8, 2016. *See* Pl.'s Resp., Barry Decl. ¶ 9(a); *id.*, Ex.

---

[6] Although the *Livingston* court held that a single act by an out of state corporation may be the basis for venue under the "transacting business" test, the Court notes this interpretation would render superfluous the "any act" basis for venue, which requires that the act constitute the violation alleged. Thus, even under the less stringent "transacting business" test set forth in *Livingston*, the Court finds the act must arise out of the defendant's in-district activities constituting the violation alleged. Indeed, the *Livingston* court implicitly recognized as much, holding the "transacting business" standard is "co-extensive" with the "minimum contacts" personal jurisdiction test, for which "a single act by an out of state corporation may subject it to the forum state's jurisdiction, if the cause of action in question arises out of that act." 294 F. Supp. at 682-83; *see also Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir. 2001) ("[T]he preferred construction of a statute and its regulations is one that gives meaning to all provisions.").

5; Defs.' Reply, Laufer Suppl. Decl, Ex. 2.[7]   Cooperman's ownership interest in REXI thus does not constitute "transacting business," as he could not have been an activist shareholder at the time the Complaint was filed.   *See Stern Fish Co. v. Century Seafoods, Inc.*, 254 F. Supp. 151, 154 (E.D. Pa. 1966) ("The venue statute speaks in the present tense so that unless the defendant was transacting business in this district at the time the action was commenced, venue is improper."); *Kurtz Bros.*, 240 F. Supp. at 364 ("[W]hen applying the transacting business test, the defendant must still be conducting substantial business in this district at the time of the commencement of the action.").   The Court finds that Cooperman's beneficial ownership in one company based in this District—Charming Shoppes, Inc. (CHRS)—out of the eight for which he allegedly failed to file the required forms, is insufficient to establish venue, especially where the SEC makes no allegation Cooperman undertook an activist shareholder role with respect to that company.   Further, the facts that Cooperman solicited a client in this District, and directed securities trading that took place on the Nasdaq PHLX, fail to establish venue, as they are unconnected to the violations alleged.

Accordingly, the Court cannot find that proper venue as to the §§ 13(d) and 16(a) claims exists under 15 U.S.C. § 78aa.  *See High River Ltd. P'ship v. Mylan Laboratories, Inc.*, 353 F. Supp. 2d 487, 493 (M.D. Pa. 2005) ("Venue must be established for each separate cause of action.").   These claims are therefore dismissed.

---

[7] The Court is permitted to consider the affidavits submitted by the parties in deciding this motion to dismiss for improper venue.  *See Leone v. Cataldo*, 574 F. Supp. 2d 471, 483 (E.D. Pa. 2008) ("Generally, when deciding a Rule 12(b)(3) motion to dismiss for improper venue, a court must accept as true the allegations in the complaint, although the parties may submit affidavits to support their positions.").

An appropriate Order follows.

BY THE COURT:


 /s/ Juan R. Sánchez
Juan R. Sánchez, J.